ISAAC TORRES PÉREZ Y OTROS, demandantes y recurridos, v. NATIVIDAD COLÓN GARCÍA e INSURANCE COMPANY OF PUERTO RICO, demandados y recurrentes; RAMÓN NEGRÓN RIVERA y BENITO SANTIAGO MARTÍNEZ, demandantes y recurridos, v. GOBIERNO DE LA CAPITAL E INSURANCE COMPANY OF PUERTO RICO, demandados y recurrentes.

*Números:* R-75-96,     *Resueltos:* 18 de enero de 1977
R-75-104

*William H. Preston, Jr.* y *Rolando A. Silva,* abogados del Municipio de San Juan; *P. Roldán Figueroa,* abogado de Isaac Torres Pérez y otros; *Enrique Leo Henríquez,* abogado de Ramón Negrón Rivera y Benito Santiago Martínez.

618

El Juez Asociado Señor Irizarry Yunqué emitió la opinión del Tribunal.

Con motivo de un choque entre un automóvil y un camión propiedad del Municipio de San Juan, se presentaron tres demandas separadas en reclamación de indemnización por daños sufridos. En las tres demandas se alegó como única causa del accidente la negligencia del conductor del camión. En una demanda figuran como demandados dicho conductor y la corporación aseguradora del camión y del Municipio. No se demandó al Municipio. En las otras demandas se demandó al Municipio y a la compañía aseguradora. El Municipio, representado por los abogados que a la vez representaban a la aseguradora, solicitó consolidación de los tres pleitos y así se dispuso. Celebrado el juicio determinó el tribunal que el conductor del camión incurrió en un 75%, y el conductor del automóvil en el restante 25% de la negligencia que causó el accidente. Dictó sentencia en los tres casos contra todos los demandados, solidariamente. En realidad la sentencia tendría que ser satisfecha por el Municipio solamente por haberse acogido la aseguradora a un procedimiento de liquidación por el Comisionado de Seguros de Puerto Rico.

El Municipio nos plantea en recurso de revisión tres cuestiones a saber: (1) que la determinación sobre negligencia no está sostenida por la prueba; (2) que el tribunal de instancia no podía dictar sentencia en su contra en el pleito en que no fue demandado, y (3) que de prevalecer la sentencia recurrida se obligaría al Municipio a pagar cantidades de dinero en exceso de los límites máximos autorizados por ley.[1] Veamos las tres cuestiones por separado y en ese orden.

---

[1] El Art. 96-A de la Ley Municipal, según enmendado, 21 L.P.R.A. sec. 1603a dispone, en lo aquí pertinente:

"Las reclamaciones contra los municipios, por daños y perjuicios a la persona o a la propiedad, causados por culpa o negligencia de la corporación municipal, no podrán exceder de la cantidad de quince mil (15,000) dólares. Cuando por una misma actuación u omisión se causaren daños y

## I

Como ocurre en casi todos los casos, en este hay dos versiones sobre la forma en que ocurrió el accidente, ambas sostenidas por la prueba de una y otra parte. El juez de instancia, luego de considerar toda la prueba, hizo sus propias determinaciones, que no equivalen precisamente ni a la versión de los demandantes ni a la de los demandados. Veamos las dos versiones y lo que el juez determinó que sucedió.

Los siguientes hechos no están en controversia: Alrededor de las siete de la mañana del sábado, 23 de noviembre de 1968, y en la carretera que conduce de Río Piedras a Caguas, ocurrió un choque entre un automóvil Mercedes Benz, conducido por Angel M. Torres Roldán, y un camión propiedad del Municipio de San. Juan. El Mercedes Benz chocó contra el camión por la parte posterior derecha de éste, se desvió a su derecha, arrolló a dos personas que esperaban transportación en una parada de guaguas a la orilla derecha de la carretera, y vino a parar al chocar contra la base de cemento de una verja. Su conductor murió en el acto. Uno de los peatones, Benito Santiago Martínez, sufrió fractura del radio y de la ulna del brazo derecho, fractura del quinto hueso metacarpio, es decir, en una mano, dislocación en la falange media del pie izquierdo y laceración del ojo izquierdo. El otro peatón, Ramón Negrón Rivera, sufrió contusiones y hematoma en una de sus extremidades. Así se estipuló, según la sentencia del tribunal a quo. El Mercedes Benz, según se aprecia en una fotografía que obra en autos, sufrió el desprendimiento de la capota, de delante hacia atrás. No hay

---

perjuicios a más de una persona, o cuando sean varias las causas de acción a que tenga derecho un solo perjudicado, la indemnización por todos los daños y perjuicios que causare dicha acción u omisión no podrá exceder la suma de treinta mil (30,000) dólares. Si de las conclusiones del Tribunal surgiera que la suma de los daños causados a cada una de las personas excede de treinta mil (30,000) dólares, el Tribunal procederá a distribuir dicha suma de treinta mil (30,000) dólares entre los demandantes, a prorrata, tomando como base los daños sufridos por cada uno. . . ."

prueba de que recibiera daños en su frente o lados. El camión es uno de carga, grande, de seis ruedas. Su caja estaba cubierta con una lona. De su parte posterior sobresalía una tapa a manera de plataforma, al mismo nivel del piso de su caja, sostenida en esa posición por una cadena. No hay prueba de que recibiera daños, excepto una abolladura, apenas perceptible en las fotografías, en el extremo posterior derecho de la caja, al nivel de su piso. Ese fue sin duda, un punto de impacto del Mercedes Benz con el camión. Es lógico inferir que los puntos de contacto entre ambos vehículos fueron, en cuanto al Mercedes Benz, el poste delantero izquierdo que sujetaba su capota al resto del automóvil, y en cuanto al camión, el borde derecho posterior de la plataforma, que a manera de cuchilla cortó dicho poste, y el extremo o esquina derecha posterior de la base de la caja del camión, que completó el descapotamiento hacia atrás del automóvil y lo hizo desviarse hacia su derecha. En el lugar del accidente la carretera era recta. Tenía dos carriles de tránsito para cada dirección, separados por un seto vivo de amapolas, interrumpido frente a la entrada del barrio Tortugo y de las parcelas Las Canejas, cuya entrada quedaba, yendo en la dirección de los dos vehículos del accidente, es decir, de Río Piedras hacia Caguas, a mano izquierda. Los autos no revelan que en el área del accidente existiera otro límite de velocidad que el dispuesto por la Ley de Vehículos y Tránsito, que es de 45 millas por hora cuando no existieren señales que otra cosa indicaren, dispuestas por el Secretario de Transportación y Obras Públicas. 9 L.P.R.A. secs. 841 y 843.

La versión de los demandantes pretendió establecer que el camión discurría por el carril derecho y detrás iba el Mercedes Benz por el izquierdo; que al acercarse a la entrada del barrio Tortugo, que era hacia donde se dirigía el camión, éste hizo un viraje súbito a su izquierda, cruzándose en el paso del Mercedes, provocando así el choque que ocurrió entre ambos vehículos. Esta versión fue sostenida por los testi-

monios del codemandante Benito Santiago Martínez y de otros dos peatones que se hallaban en el lugar del accidente.

La versión de los demandados emana de los testimonios del codemandado Natividad Colón García, que era el conductor del camión, y de un celador de una estación de gasolina que quedaba cerca del lugar. El conductor del camión declaró que iba por el carril de la derecha y doscientos metros antes de llegar a la entrada del Barrio Tortugo cambió al carril izquierdo, que hizo señales con la mano y con las luces de señales y se detuvo en el carril izquierdo a esperar que pasasen los carros que iban en dirección contraria, para entonces cruzar y seguir por la entrada hacia el Barrio Tortugo; que hacía varios minutos que estaba así detenido cuando sintió el golpe del automóvil. El testimonio del celador varía tal versión. Declaró que vio a los dos vehículos, ambos por el carril izquierdo; que el automóvil seguía al camión a una distancia que estimó como el espacio que ocuparían "de cuatro a cinco carros," distancia que señaló para el tribunal y fue estimada en noventa pies; que el carro iba "bastante ligero," a una velocidad que estimó entre 35 y 40 millas por hora, velocidad que calculó porque dice que sabe guiar; tiene 68 años; que había un seto vivo de amapolas en el centro de la carretera, contiguo al carril izquierdo, y el camión paró, que donde paró todavía había amapolas; que en el momento en que paró el camión vino el carro y ocurrió el choque; que fue "en seguida," una cosa rápida, "súbito, de momento." (²)

El juez sentenciador no creyó totalmente ni la versión de los demandantes ni la de los demandados. Concluyó que el

---

(²) Una declaración jurada del codemandante Ramón Negrón Rivera, prestada dos semanas después del accidente, se desvirtúa a sí misma en cuanto pretendió ser usada por los demandados para probar su versión del accidente. Lo declarado por el testigo es más bien una conclusión de referencia, pues vino a darse cuenta del choque después que ocurrió. Dijo: "Frente al carro ese no ví ningún otro vehículo y a mí me llamó la atención ese carro que venía, porque me gritaron, pero ya había chocado con el truck."

camión iba por el carril izquierdo y que, al disponerse a doblar para su izquierda para entrar por la carretera del barrio Tortugo, "se abrió un poco y ocupó una parte del 'lane' derecho por donde también en ese preciso momento discurría el automóvil Mercedes Benz", produciéndose así el impacto. Señala además que la posición de la plataforma móvil del camión, que se mantenía al mismo nivel de la plataforma fija mediante dos cadenas que la sostenían y que sobresalía hacia atrás no tenía luces ni banderas que indicasen sus extremos. Concluyó también que la velocidad del Mercedes fue causa concurrente del accidente, aunque no la principal. A base de esas determinaciones aplicó la norma de comparación de negligencias.

Las determinaciones del tribunal de instancia en cuanto a cómo ocurrió el accidente no son del todo justificables a base de la prueba. Estamos de acuerdo en que hubo concurrencia de negligencia pero no podemos convenir en que la del conductor del camión fue mayor que la del conductor del automóvil.

■ Hay tres procesos o métodos de que se vale el juzgador, consciente o inconscientemente, para aquilatar las pruebas y formar juicio sobre los hechos. Uno se refiere a la prueba de tipo objetivo en que se trata, al decir del Art. 95 de la Ley de Evidencia, 32 L.P.R.A. sec. 1861, de "objetos perceptibles a los sentidos." Es lo que Jones y otros destacados estudiosos del Derecho probatorio—Wigmore, McCormick, Wharton—denominan la prueba de carácter "autóptico", que provee "los vehículos de percepción por el tribunal por medio de sus observaciones personales, en contraste con el vehículo del testimonio descriptivo, narrativo y analítico de labios de los testigos." [3] La forma de un objeto, su contundencia, y todas sus particularidades físicas caen en esta clasificación. Una fotografía podría ser así considerada, pero únicamente respecto a lo que gráfica o pictóricamente revela.

---

[3] Jones, *On Evidence*, vol. 2 sec. 441.

Frente a este tipo de prueba nuestra posición y la del tribunal de instancia son idénticas. Vemos lo que él vio.

En el proceso de formar juicio los tribunales se valen también del proceso deductivo, en que entran en juego las inferencias y presunciones. De una o varias verdades se deduce otra verdad, sea porque lo manda la ley (presunción) o porque lo concluye por deducción lógica el juzgador (inferencia). Tampoco requiere mayor esfuerzo mental este medio de prueba. Es el método del silogismo; la lógica al servicio del proceso adjudicativo. Podríamos decir que, aceptados como ciertos los hechos básicos de una presunción o de una inferencia, nuestra posición como tribunal revisor no es muy distinta de la del tribunal de instancia para dar por probado el el hecho deducido.

Donde se halla la médula del problema adjudicativo es cuando toca al juez dirimir conflictos en la prueba, decidir sobre probabilidades, descartar imposibles, hurgar más allá de los testimonios para encontrar las verdades que muchas veces se ocultan tras meras apariencias, suplir a base de sus propias experiencias y conocimientos de la vida aquellos hechos no aportados articuladamente por los testimonios pero inescapables al proceso inductivo de su inteligencia. Sin duda este proceso exige más de la subjetividad del juzgador que ningún otro. Su base estatutaria está en el Art. 99 de la Ley de Evidencia, 32 L.P.R.A. sec. 1884, que señala en su inciso segundo, como base de una inferencia, la deducción que de un hecho probado legalmente "justificaren la consideración de las ordinarias propensiones o pasiones humanas, las propensiones o pasiones particulares de la persona cuyo acto se discute, el curso de los negocios o el de la naturaleza."

Conforme a este principio, las experiencias que han contribuido a forjar el carácter y determinar las actitudes del juez de instancia subyacen como premisas inarticuladas que explican sus decisiones. Cada mundo interior de cada juez ha de fallar a su modo, fallos que por esa misma razón pueden

ser distintos según el proceso inductivo de cada cual, siendo todos igualmente válidos y respetables. (⁴) Por supuesto, toda determinación sobre hechos probados a base de ese proceso inductivo debe ser razonable. No podría sostenerse si resulta absurda, si es arbitraria, o si es el resultado de un juicio apasionado o prejuiciado. Véanse Art. 162, Ley de Evidencia, 32 L.P.R.A. sec. 1679, primer párrafo; (⁵) *Rosario v. A. de T.*, 97 D.P.R. 324, 329 (1969) ; *García Rivera v. Tribunal Superior*, 86 D.P.R. 823, 831 (1962).

Aplicados esos principios al caso ante nos tenemos que respetar la conclusión de que el camión iba por el carril izquierdo y que al tratar de virar a la izquierda se abrió a su derecha y se detuvo, actuaciones que evidentemente no anticipaba el conductor del automóvil.

Tienen apoyo estas determinaciones en testimonios que creyó el juez sentenciador y en la prueba fotográfica. La conclusión de que el camión se abrió a su derecha para luego girar a la izquierda encuentra apoyo además—he aquí el proceso inductivo en funciones—en la experiencia de la diaria observación de los hábitos de los conductores de camiones en nuestras carreteras. Raro es el que no se abre a la derecha antes de virar a la izquierda, y viceversa.

La conclusión de que el automóvil discurría por el carril derecho no está apoyada por la prueba. Por el contrario, todos los testimonios colocan al automóvil en el carril izquierdo, y no hay justificación en este caso para descartar esos testimonios.

Parece evidente que el conductor del automóvil, que había estado ingiriendo licor—tenía en su sangre un contenido de

---

(⁴) Para una excelente exégesis sobre el proceso inductivo véase Eduardo Bonnier, *Tratado de las Pruebas en Derecho Civil*, Tomo I, pág. 17 ss. (traducción de la quinta edición francesa de la Editorial Reus, Madrid).

(⁵) Dice así:

"El efecto de la evidencia no es arbitrario, sino que se ejercerá con discreción jurídica, y sujeción a las reglas de evidencia."

alcohol de diez centésimas (.10) del uno por ciento—y que probablemente no había dormido, pues regresaba hacia su casa cerca de las 7:00 de la mañana de un sábado, reaccionó tardíamente al percatarse del movimiento del camión, su velocidad no le daba tiempo de parar y, al desviarse hacia el carril derecho para pasarle no vio la plataforma que a manera de cuchilla sobresalía de la parte posterior del camión, ya parcialmente atravesado en el carril izquierdo y ocupando parte del derecho, produciéndose así el lamentable accidente en que perdió la vida.

Frecuentemente escuchamos decir que el conductor del vehículo que choca a otro por detrás tiene toda la culpa. Ciertamente, un choque de esta naturaleza hace surgir un fuerte indicio de culpa de parte del vehículo que choca. Pero no puede ni debe adoptarse como norma que este tipo de choque por sí solo exonera de responsabilidad al conductor del vehículo chocado. El caso ante nos es un ejemplo de imprudencia concurrente del conductor del vehículo que discurría frente al otro. El tribunal de instancia no dio crédito a su testimonio de que hizo señales antes de virar. Parece obvio que, o no las hizo, o las hizo tardíamente y sin ajustarse a la ley. ([6]) De haberlo hecho, y de haber reducido gradualmente su velocidad antes de detenerse para virar es probable que no hubiese ocurrido el accidente. Concluimos que la imprudencia del conductor del camión fue causa que contribuyó al accidente cuando menos en un 25 por ciento.

## II

El segundo planteamiento del Municipio de San Juan, aquí recurrente, es de orden procesal. Como indicamos al principio, se presentaron tres demandas con motivo del acci-

---

([6]) La Ley de Vehículos y Tránsito dispone:

"Toda señal de viraje, deberá hacerse en la vía pública continuamente en el trayecto de los últimos cien (100) pies inmediatamente antes de virar." 9 L.P.R.A. sec. 984.

dente. En una figuran como demandantes los padres y varios hermanos del conductor del automóvil Mercedes Benz, fallecido en el accidente. Demandaron a Natividad Colón García, conductor del camión, y a Insurance Company of Puerto Rico, aseguradora del Municipio. No demandaron al Municipio. En demandas separadas comparecieron Ramón Negrón Rivera y Benito Santiago Martínez, peatones que resultaron lesionados, quienes demandaron al Municipio de San Juan y a Insurance Company of Puerto Rico. La representación de todos los demandados fue asumida por los abogados de Insurance, quienes solicitaron la consolidación de los tres pleitos, y así se dispuso. Se acordó ventilar en primer lugar el aspecto de responsabilidad por el accidente, así se hizo y se dictó resolución en mayo de 1972 que dictaminó que el conductor del camión incurrió en un 75 por ciento de negligencia y en un 25 por ciento el conductor del Mercedes. Estando pendiente de celebrarse vista sobre el monto de los daños fue sometida a proceso de liquidación la compañía aseguradora. El Municipio de San Juan tuvo que asumir su propia representación toda vez que, al desaparecer Insurance del pleito, cesó con ello la representación que habían estado ostentando sus abogados.

Plantea el Municipio que como no fue demandado por los padres y hermanos del conductor del automóvil Mercedes Benz, no puede dictarse sentencia en su contra en el caso de ellos. Tiene razón.

■■■ La comparecencia del Municipio, representado por los abogados de su aseguradora, no tuvo el alcance de enmendar la demanda en que no fue hecho parte. La causa de acción contra el Municipio es distinta y separada de la instada contra su aseguradora. Art. 20.030 del Código de Seguros. 26 L.P.R.A. sec. 2003. (⁷) *García* v. *Northern Assurance Co.*, 92

---

(⁷) Dicho artículo dispone en su inciso (1), aquí pertinente:

"(1) La persona que sufriere los daños y perjuicios tendrá, a su opción, una acción directa contra el asegurador conforme a los términos y

D.P.R. 245, 254 (1965) ; *Trigo* v. *The Travelers Ins. Co.*, 91 D.P.R. 868 (1965). Al consolidarse los tres pleitos, cada parte conservó su identidad independiente en cada uno, sin que ello implicase que el Municipio quedara incluido como parte en el pleito en que no lo era. De hecho la aseguradora, precisamente por la independencia de las causas, no podía invocar contra los demandantes las defensas personales que el Municipio, de haber sido demandado, pudo invocar, y en particular la falta de notificación dentro de los 90 días a partir de la ocurrencia del accidente. Art. 96 de la Ley Municipal, 21 L.P.R.A. sec. 1603; *García* v. *Northern Assurance Co.*, supra, pág. 254. No hay constancia en los autos de tal notificación hecha por los padres y hermanos del conductor fallecido. La hay en cuanto a los demandantes que demandaron al Municipio.

En *Vda. de Rivera* v. *Pueblo Supermarket*, 102 D.P.R. 134 (1974), consideramos que una demanda quedó enmendada para incluir a terceras demandadas como si hubiesen sido demandados originales, y hacerlas responsables directamente a la parte demandante, al estipularse por todas las partes, incluyendo a las terceras demandadas, la relación que las hacía responsables directamente a la parte demandante, cuya estipulación concluía con la solicitud de que "se dicte la sentencia que proceda en derecho a tenor con los hechos antes estipulados." La situación aquí es distinta. Salvo en la solicitud de consolidación, en que se hizo figurar al Municipio de San Juan como promovente, en todas las alegaciones respondientes de las partes compareció cada parte por separado, se-

limitaciones de la póliza, acción que podrá ejercitar contra el asegurador solamente o contra éste y el asegurado conjuntamente. La acción directa contra el asegurador se podrá ejercer solamente en Puerto Rico. La responsabilidad del asegurador no excederá de aquella dispuesta en la póliza, y el tribunal deberá determinar no solamente la responsabilidad del asegurador, si que también la cuantía de la pérdida. Cualquier acción incoada conforme a esta sección estará sujeta a las condiciones de la póliza o contrato y a las defensas que pudieran alegarse por el asegurador en acción directa instada por el asegurado."

gún figuraba en cada demanda, y, una vez consolidados los casos, la comparecencia de los demandados se hizo figurar haciéndose la salvedad que comparecían "los demandados, debidamente incluidos como tal y emplazados en uno u otro caso de epígrafe." Dicho de otro modo, comparecían todos los demandados, pero cada cual en la forma en que estaba incluido en el pleito, es decir, la Insurance Company como demandada en los tres casos, el Municipio como demandado en los casos de Negrón Rivera y de Benito Santiago Martínez, y Natividad Colón García como demandado en el caso de los padres y hermanos del conductor fallecido.

■ La coincidencia de que el Municipio y su aseguradora comparecieran representados originalmente por los mismos abogados no podía implicar que forzosamente quedaba el Municipio sometido como parte demandada en relación con la demanda en que no fue hecho parte. La práctica en materia de seguros de responsabilidad pública—de ello tomamos conocimiento judicial—es que la aseguradora se obliga a asumir la representación de su asegurado, por sus abogados, hasta los límites máximos de su responsabilidad bajo la póliza. Es de conocimiento general que en los casos de los municipios la responsabilidad de la aseguradora de éstos se limita al máximo de que el municipio puede legalmente responder. Véase el Art. 96-A, citado en el escolio 1, *supra*.

Finalmente, y distinto al caso de *Pueblo Supermarket*, supra, el Municipio de San Juan, aquí recurrente, no tomó parte activa en relación con la reclamación en que no fue demandado que justifique que se le considere incluido como parte en dicho caso. Por el contrario, cuando se entró en la segunda etapa del litigio para fines de determinar el valor pecuniario de los daños, el Municipio limitó expresamente su participación a defenderse de las dos reclamaciones en que fue demandado, así lo hizo constar, y como resultado de ello se limitó la prueba en la vista que a tales efectos se celebró, a la presentada por dichos dos demandantes.

## III

El tercer planteamiento del Municipio se refiere a los límites de su responsabilidad bajo el Art. 96-A de la Ley Municipal, citado antes en el escolio 1. Habiendo concluido nosotros que el Municipio no es parte demandada y por tanto no responde a los padres y hermanos del conductor fallecido, queda limitada su responsabilidad a los daños sufridos por Ramón Negrón Rivera y Benito Santiago Martínez. Por disposición del citado Art. 96-A, su responsabilidad no podrá exceder de $15,000 en cuanto a alguno, ni de $30,000 en cuanto a ambos. Habiendo sido el Municipio un co-causante del accidente, su responsabilidad frente a estos demandantes es solidaria con la del conductor del camión, por quien responde, y con la del conductor del Mercedes Benz, hoy su sucesión. *Mártir Santiago* v. *Pueblo Supermarket,* 88 D.P.R. 229 (1963); *Rivera* v. *Great Am. Indemnity Co.,* 70 D.P.R. 825, 828 (1950). Habiendo dictado sentencia el tribunal de instancia en que valoró los daños sufridos por Benito Santiago Martínez en $20,000, debe limitarse la responsabilidad del Municipio, en cuanto a él, a $15,000. Por no alcanzar a dicha suma el valor adjudicado por dicha sentencia a los daños sufridos por Ramón Negrón Rivera ($3,000), en nada se afectará en cuanto a él la responsabilidad del Municipio.

*Se dictará sentencia por la que se modifique la dictada por el tribunal de instancia en los casos ante nos, en los siguientes términos: se fijará la responsabilidad de los demandados por la ocurrencia del accidente en un 25 por ciento, correspondiendo el restante 75 por ciento al conductor del automóvil Mercedes Benz; se dejará sin efecto aquella parte de la sentencia en relación con el caso número 69–3964 (Isaac Torres Pérez y otros v. Natividad Colón García e Insurance Company of Puerto Rico) que responsabiliza al Municipio de San Juan; y se reducirá la responsabilidad del Municipio de San Juan frente a Benito Santiago Martínez, caso número*

*70–697, a la suma máxima de $15,000. Así modificada, la sentencia del tribunal recurrido será confirmada.*

El Juez Asociado Señor Negrón García disintió con opinión en la cual concurren los Jueces Asociados Señores Torres Rigual y Díaz Cruz.

—O—

Opinión disidente del Juez Asociado Señor Negrón García con la cual concurren los Jueces Asociados Señores Torres Rigual y Díaz Cruz.

San Juan, Puerto Rico, a 18 de enero de 1977

Respetuosamente disiento. El análisis integral de la prueba testifical y documental[1] me convence que estamos ante un caso de excepción al cual no aplica la regla de abstención del foro apelativo respecto a la apreciación de prueba de los tribunales de primera instancia. La opinión mayoritaria se fundamenta en el respeto que tales determinaciones merecen, criterio que comparto como regla general, pero que no rige el caso de autos. Inexplicablemente la propia opinión, aun cuando defiende dicha norma, la vulnera.

Descartada por la sala sentenciadora, por no haberle merecido crédito, las alegaciones y prueba de los demandantes recurridos—en el sentido de que el camión del Municipio discurría por el carril de extrema derecha y causó el accidente al invadir súbitamente el carril de la izquierda con el propósito de oportunamente doblar para entrar en la carretera del Barrio Tortugo (Las Canejas)—no me es posible sostener la conclusión de responsabilidad del Municipio recurrente en

---

[1] En *García* v. *A.F.F.*, 103 D.P.R. 356 (1975), el Tribunal expuso el valor del análisis de perspectiva integral de la prueba, en particular aquella que posee garantía circunstancial de veracidad, tales como fotografías contemporáneas a los hechos.

orden al movimiento del camión, existencia y posición de su plataforma móvil y ausencia de signo al efecto. (²)

A mi juicio, la forma en que ocurrió el accidente quedó aclarada por la declaración jurada prestada ante el Ministerio Fiscal por el codemandante recurrido Ramón Negrón Rivera, quince (15) días después del accidente:

"El día 23 de noviembre de 1968, yo estaba en una parada de guaguas que hay un poco retirada de la entrada a las Parcelas Canejas, en la carretera de Río Piedras a Caguas. Yo iba para mi trabajo en Caguas, y eran como las siete menos cuarto de la mañana. Mientras estaba esperando transportación, *vi venir por el carril izquierdo* de los carriles que van de Río Piedras a Caguas *un truck* y al llegar a la entrada de las Parcelas Caneja, se detuvo, o casi se detuvo cuando de momento se apareció un carro que no me di cuenta por cual carril corría *a una velocidad bastante ligero, y fue a darle al truck por la parte de atrás, y trató de desviar a la derecha,* y con la parte trasera derecha del truck rompió el cristal del frente del carro. Ese carro siguió sin control yendo a tener a la parada donde yo me encontraba con otra perosna, que también iba para Caguas y nos arrolló a los dos y luego siguió, subiéndose en una lomita, donde había un muro de concreto, el cual partió y ahí se detuvo. De ahí me recogió mi hijo y me llevó al Dispensario de los Tronquistas en los altos de la Farmacia Blanco en la Pda. 19 de Santurce. Yo no vi al que guiaba ese carro ni sé qué marca era el carro." (Exhibit I, parte demandada, énfasis suplido.)

Esta declaración es de suma importancia, ya que es brindada antes de que el testigo hubiese radicado una acción en resarcimiento de daños; en otras palabras, cuando su único interés era el de exponer la verdad ante un funcionario público en una época contemporánea a la ocurrencia del accidente. Fácil es comprender sus motivos para que en la vista posterior del caso, establecido su rol e interés como reclamante,

---

(²) La Sec. 7-101 de la Ley de Tránsito—Núm. 141 de 20 de julio de 1960, según enmendada (9 L.P.R.A. sec. 1371)—no es fuente legal para exigir la colocación de una bandera roja la cual se exige para cargas que se transporten.

variara la misma y entonces expresara no haberse percatado del choque hasta después de ocurrido. *Román Montalvo* v. *Delgado Herrera*, 89 D.P.R. 428 (1963).

En adición, las fotografías en evidencia[3] demuestran indubitadamente que el conductor Torres Roldán discurría su auto Mercedes Benz a una velocidad exagerada en exceso del máximo permitido. La fuerza del impacto fue de tal naturaleza que arrancó y desplazó hacia atrás como si fuera un acordeón de papel la capota de acero del vehículo, el cual continuó en rápido y descontrolado movimiento varios metros adelante, arrollando en su vertiginosa trayectoria a los dos peatones reclamantes y deteniéndose solamente al chocar una verja cuya base de cemento le sirvió de obstáculo. La doctrina jurisprudencial de que prueba relativa a la fuerza del impacto de una colisión, por sí sola, o en relación con otras circunstancias, puede tener suficiente peso para justificar la conclusión de que hubo negligencia en cuanto a la velocidad de un vehículo es de estricta aplicación al caso de autos. *Santos Rivera* v. *Quiñones de la Rosa*, 93 D.P.R. 491, 499 (1966); *Valedón* v. *Fernández*, 78 D.P.R. 257, 261 (1955); *Pueblo* v. *Busigó*, 78 D.P.R. 162, 168 (1955); *Pueblo* v. *Rivera*, 69 D.P.R. 538, 543 (1948). También dichas fotografías establecen la ubicación de los residuos (*debris*) consistentes del cristal delantero y otras partes metálicas de la capota ocupando la superficie de la zona de rodaje correspondiente al carril de extrema izquierda, extendiéndose en parte hacia la del carril derecho, circunstancia ésta incompatible con el criterio del tribunal sentenciador de que el Mercedes Benz transitaba por éste último carril antes de ocurrir el accidente.

A las circunstancias expuestas de velocidad y residuos,

---

[3] Al evaluar la prueba documental estamos en igual posición que el tribunal sentenciador. *Ortiz* v. *Cruz Pabón*, 103 D.P.R. 939 (1975); *Planned Credit of P.R., Inc.* v. *Page*, 103 D.P.R. 245 (1975).

debemos añadir dos factores de importancia que afectaron negativamente la condición física de su conductor: éste regresaba a su hogar en Caguas al amanecer del sábado, luego de haber asistido y terminado su trabajo el día anterior, viernes, y su protocolo de autopsia reveló la existencia de .10 grados de alcohol en la sangre. (T.E. págs. 126–127.) Es un hecho científico, susceptible de conocimiento judicial, que los reflejos normales de una persona con dicho nivel de alcohol, en lo concerniente a la conducción de un vehículo de motor, de ordinario disminuyen y se afectan.

Si a ello abonamos la plena visibilidad que existía, es forzoso resolver que la causa próxima y única del accidente fue la negligencia del conductor Torres Roldán. Tal conclusión se impondría aun bajo la tesis de que el camión, mientras se encontraba en el carril izquierdo, al realizar el viraje se abrió a la derecha un poco, ya que el testigo Eusebio Delgado, de ocupación celador, atestó que tal operación se realizó despacio, deteniéndose el camión, siendo impactado en su parte posterior por el Mercedes Benz que discurría por el carril izquierdo al intentar ocupar el de la derecha. (T.E. págs. 112–113.) Un camión del peso y dimensión como éste sólo podía desarrollar tal viraje en la forma lenta en que este testigo la describe. Solamente la excesiva velocidad del automóvil, la condición de su conductor y el incumplimiento de la regla de seguridad referente a mantener una distancia prudente preceptuada en la Sec. 5-1108 de la Ley de Vehículos y Tránsito (9 L.P.R.A. sec. 1138(a))—*Sociedad de Gananciales* v. *Pérez González*, 90 D.P.R. 194, 195–196 (1964)—le impidieron aminorar la marcha y evitar el accidente.

Revocaría en su totalidad la sentencia del Tribunal Superior.